## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**MARY BOTSAY**                                      **CIVIL ACTION**

**VERSUS**                                           **NO. 14-2573-MLCF-SS**

**CAROLYN W. COLVIN, ACTING**
**COMMISSIONER OF THE SOCIAL**
**SECURITY ADMINISTRATION**

### REPORT AND RECOMMENDATION

The plaintiff, Mary Botsay ("Botsay"), seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for disability insurance benefits and a period of disability under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423 and her claim for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382c(a)(3).

### PROCEDURAL HISTORY

On August 6, 2012, Botsay submitted an application for SSI.  R. 156-161.  On August 27, 2013, she submitted an application for disability insurance benefits.  R. 162-165.  She reported that she became unable to work on August 26, 2011.  R. 162.  She reported:  (1) pain in her right knee and in both hands and feet; (2) osteoarthritis degenerative in right knee; (3) left foot mild degenerative hallux valgus (bunion) deformity; (4) left hand and right hand bilateral pain; and (5) right shoulder pain - possible nerve damage.  R. 193.  On September 24, 2013, her applications were denied.  R. 90-98.  On March 20, 2014, there was a hearing before an Administrative Law Judge ("ALJ").  Botsay was represented by counsel.  R. 39-83.  On May 21, 2014, the ALJ issued an unfavorable decision.  R. 23-38.  On September 15, 2014, the Appeals Council denied her request for review.  R. 1-5.

On November 11, 2014, Botsay filed a complaint in federal court for review of the Commissioner's decision.   Rec. doc. 1.   The Commissioner filed an answer and the administrative record.   Rec. docs. 9 and 10.   The parties filed cross-motions for summary judgment.  Rec. docs. 14 and 15.

## STATEMENT OF ISSUE ON APPEAL

Issue.   Did the ALJ abuse his discretion in evaluating Botsay's credibility and residual functional capacity ("RFC")?

## THE COMMISSIONER'S FINDINGS

The ALJ made the following findings:

1. Botsay met the insured status requirements of the Act through September 30, 2016.

2. Botsay had not engaged in substantial gainful activity since August 1, 2012, the alleged onset date (20 C.F.R. §§ 404.1571 *et seq*., and 416.971 *et seq*.).

3. Botsay had the following severe impairments:  degenerative joint disease of the right knee, right borderline mild carpal tunnel syndrome, and right rotator cuff sprain and tendinitis (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

4. Botsay did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. Botsay had the RFC to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) except she was limited to occasionally climbing ramps and stairs; never climbing ladders, ropes and scaffolds; occasionally stooping, kneeling, crouching and crawling; frequently performing overhead reaching with the dominant right upper extremity; frequent handling, fingering and feeling with the dominant right upper extremity.

6. Botsay was capable of performing past relevant work as a customer service representative and data entry clerk.  This work did not require the performance of work-related activities precluded by Botsay's RFC (20 C.F.R. §§ 404.1565 and 416.965).

7. Botsay was not under a disability, as defined by the Act, from August 1, 2012, through May 21, 2014, the date of the decision (20 C.F.R. §§ 404.1520(f) and 416.920(f)).

R. 28-34.

## ANALYSIS

a.     **Standard of Review.**

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.  Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); Perez, 415 F.3d at 461.  Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  This court may not re-weigh the evidence, try the issues *de novo* or substitute its judgment for the Commissioner's.  Perez, 415 F.3d at 461; Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Villa, 895 F.2d at 1022; Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

To be considered disabled and eligible for disability insurance benefits, plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (1997).  The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.  Id. §§ 404.1520, 416.920; Perez v. Barnhart, 415 F.3d at 461; Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 514 U.S. 1120, 115 S. Ct. 1984 (1995).[1]  The five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled.  Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995).

---

[1]  The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (1994) ("Medical-Vocational Guidelines").

The claimant has the burden of proof under the first four parts of the inquiry.  Id.  If she successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing.  Greenspan, 38 F.3d at 236; Kraemer v. Sullivan, 885 F.2d 206, 208 (5th Cir. 1989).   When the Commissioner shows that the claimant is capable of engaging in alternative employment, "the ultimate burden of persuasion shifts back to the claimant."  Id.; accord Selders, 914 F.2d at 618.   "In determining whether substantial evidence of disability exists, this court weighs four factors: (1) objective medical evidence; (2) diagnoses and opinions; (3) the claimant's subjective medical evidence of pain and disability; and (4) the claimant's age, education, and work history."  Perez v. Barnhart, 415 F.3d at 462.  "The Commissioner, rather than the courts, must resolve conflicts in the evidence."  Martinez v. Chater, 64 F.3d 172, 174 (5th Cir. 1995).

b.      **Testimony at Hearing.**

Botsay completed the 12th grade. R. 77.   She did not attend college or have any vocational training. R. 77.  She was born in 1954. R. 77.  She had not worked since August 1, 2012. R. 48.  The onset date was amended to August 1, 2012.  R. 43.

In her last job she worked as a secretary in customer services.  She was not working on a computer.  She began to suffer with her legs.  Her right knee would swell after sitting for eight hours.  She worked there for about six weeks when she had to stop in August 2011.  R. 48.

Previously she did computer work and secretarial work.  R. 49.  She worked in the steamship business for 18 years.  R. 49.  She did data-entry to complete U.S. Customs forms and other documents.  R. 49.  She took inventory in the container yards once a month.  R. 49.

Numbness in her hands and pain in her knees prevented her from working.  R. 58.

Since August 2012, she had problems with her hands.  If she typed for about 15 minutes, her hands became numb, they started burning, and it felt as though they were stuck with pins and needles.  R. 50 and 56.  The night before the hearing, her hands were burning, they ached constantly, and she felt pins and needles.  R. 55.  She had to shake them until the sensation went away.  R. 56.  She was told that arthritis or carpal tunnel syndrome may be causing problems with her hands.  R. 56.  Tests (Phalen's, Durkan's and Tinel's) were positive indicating nerve involvement.  R. 56.  She had not received a diagnosis for the hands and there had been no treatment for the hands.  R. 57 and 70.

Botsay's shoulder hurt.  She used ice packs to ease the pain.  R. 50.  She experienced painful inflammation in her arm and back.  An MRI indicated it was inflamed.  R. 53-54.

Botsay's right knee hurt with a burning sensation.  The left knee bothered her a little but not like the right knee.  R. 54 and 66.  The pain in her right knee was almost always a ten.  She suffered constant knee pain.  R. 67.  It buckled and became swollen.  R. 65.  She could not kneel. R. 67.  If she walked a lot (three or four blocks), her knee really bothered her.  She had to stop five or six times while walking that distance.  R. 75.  She took showers.  She held onto a bar in case her leg bent under her.  R. 67.  She fell once when the knee buckled.  R. 68.

When Botsay's right knee became swollen, she could hardly bend it.  She had to drag it around.  R. 58-59.  It became inflamed often.  R. 53-54.  It was getting worse.  R. 65.  She had to lie down for about 45 minutes with an ice pack on the leg and elevate her legs and shoulder.  R. 50 and 57.  She put ice packs on her leg four or five times a day to keep it from swelling.  R. 58. It took a couple of days for the swelling to go down.  R. 58.

Botsay's doctors at LSU did not recommend surgery or a knee replacement.  R 50 and 51. She received only conservative treatment for her knee.  R. 51.  She got a steroid injection on

6

March 7, and was waiting on physical therapy for her knee.  R. 51.  She used a knee brace prescribed by Dr. Young at LSU.  She was told to get the knee brace because her knee buckled when she walked.  She was given a home exercise program.  R. 52.

Botsay felt pins and needles in her feet.  She did not know what caused the sensation.  She did not have diabetes.  R. 55.  She experienced inflammation in her feet.  R. 53-54.  On a one to ten scale, the pain in her feet was an eight at its worst.  R. 62.

The bunion on the side of her foot hurt.  R. 62.  She took pain medication, Tramadol, for her bunions.  R. 59.  Her primary care physician referred her to LSU for an orthopedic evaluation for bunionectomy.  R. 59.  LSU never addressed the bunion surgery.  R. 60.  It mainly addressed the shoulder and the knee.  R. 60.

If she wore shoes, her feet hurt constantly.  R. 62.  Her toes cramped.  R. 62.  Two of her toes would not touch down flat.  R. 62.  Wearing open shoes relieved the foot pain.  R. 62.  She liked flip-flops because they were more comfortable.  R. 59 and 62.

Botsay's doctors prescribed Celebrex, Tramadol and Naproxen.  R. 51.  She was allergic to Cymbalta.  R. 61.  The medication did not relieve the pain.  R. 61.  She was referred to a rheumatologist.  R. 53.  LSU did not have enough time to see each patient.  R. 57.  She had to wait six hours for her last appointment.  On her last visit, there were 83 patients waiting to be seen.  R. 57.  She did not feel she was receiving the right care at LSU.  R. 60.

Botsay's difficulty standing began the year before the hearing with the ALJ.  R. 63.  Her condition was getting worse.  R. 63.  She could not change the sheets on her bed.  R. 62-63.  It hurt her to try to pull the sheets off the bed.  R. 64.  Her hands became numb.  It felt like they were being stuck with pins and needles.  R. 65.  She could not vacuum because moving her arm caused it to hurt and she felt pins and needles.  R. 64.  She could not curl or dry her hair, because

her arm would lock and she felt pins and needles.  R. 65 and 68.  She had to wait for it to unlock before she could straighten out the arm.  R. 54.  She had trouble opening jars.  R. 54.  She could not stand up and cook or do laundry.  R. 62-63.

Botsay scrambled an egg in the morning for breakfast.  She fixed yogurt and cereal.  At lunch she made a sandwich.  At dinner she warmed something in the microwave or fried something in a pan. R. 63.  She used to make big dinners for her son and herself, but she could not any longer.  R. 64.

Botsay lived alone.  R. 63.  Her older sister helped her.  R. 64.  She came three times a week.  R. 64.  She changed the sheets, vacuumed, and dusted.  R. 64.

Botsay went to the grocery store every once in a while, but she could not pick up and carry groceries.  R. 65.  She did not buy a gallon of milk.  She only bought milk in quart containers.  R. 65.  If she carried something heavy, it put pressure on her knee.  R. 65.

Botsay could not type for more than 15 or 20 minutes on her computer at home before her hands became numb and she felt pins and needles.  R. 56 and 68.  She had to stop for about 45 minutes before she could resume typing.  R. 68.  The condition of her right and left hand were about the same.  R. 69.  Her handwriting was not good.  R. 69.  If she tried to write for a long time, she felt pins and needles.  R. 70.  The pain in the shoulder was a constant ache.  When she moved her shoulder, she heard it cracking.  R. 69.  As she sat at the hearing, her feet were numb.  It felt like pins and needles stuck in them.  R. 71.

In a typical day, she sat in her chair, watched TV, read a book or went out and sat on her little patio.  R. 73.  When she was outside, she talked to her neighbor.  She did not sit outside long.  R. 73.  She had a few little flowers and plants in a window that she watered.  R. 74.

Sometimes she went to lunch with her older sister.  R. 73.  She visited her older sister a lot.  R. 74. Her younger sister from Atlanta visited her for two weeks.  R. 74.

She did not have any hobbies.  She used to paint, but she could not because her hand was not steady.  R. 73.  She only used the computer about 15 minutes before she felt pins and needles in her fingers.  R. 74.  She used to walk and ride bikes but she could not do these activities.  R. 74.  The doctors did not tell her that she should walk for exercise.

With the hypothetical question provided by the ALJ, the vocational expert testified that Botsay could do her past relevant work.  R. 78-79.  Based on the hypothetical question posed by Botsay's counsel, she would not be able to work.  R. 79-80.

c.     **Medical Evidence**.

On May 22, 2012, Botsay was seen at the Jefferson Community Health Center ("JCHC") by Renetta Allen, DNP FNP-C (Doctor of Nursing Practice and Family Nurse Practitioner Certification), for complaint of swelling in the right knee.  She reported falling about a year before when she tripped over a gate that kept her dog in the house.  She was unemployed.  The assessment was pain in the knee joint and hand.  X-rays were ordered.  R. 415.

On May 23, 2012, Botsay was seen by Dorothy Fulmer, DPM (Doctor of Podiatric Medicine) at JCHC for pain on the top of her foot.  On the left foot, there was tenderness on palpation of the head of the second metatarsal with tenderness upon range of motion.  No lower extremity weakness was observed.  The assessments were foot pain, hallux valgus (bunion) and metatarsalgia (ball of foot becomes painful and inflamed).  R. 414.

On May 29, 2012, there were X-rays of Botsay's left foot, left hand and right knee.  R. 387-89.  The impression for the left foot was bunion deformity and no acute abnormality.  R. 387.  The impression for the left hand was degenerative changes at the first carpometacarpal joint

9

and second and third proximal interphalangeal joints.   There was no acute radiographic abnormality.   R. 388.   The impression for the right knee was moderate tricompartmental osteoarthrosis with chondrocalcinosis possible osteochondral bodies.   The findings raised the question of CPPD (Calcium Pyrophosphate Dihydrate) crystal deposits in the knee joint.  R. 389.

On June 13, 2012, Botsay returned to Dr. Fulmer for a follow-up on the foot pain after the x-rays.   On physical exam, the ankles did not show full range of motion (decreased dorsiflexion bilaterally), feet showed an abnormal appearance, including bunions on both feet, there was no warmth of the toes, on the right foot the second toe was a flexible hammer toe, and on the left foot the second was a crossover toe (subluxation).   An antalgic gait was observed. She was referred to an orthopedic surgeon.   Celebrex was prescribed.   She was to wear comfortable shoes and tape her toe down with moleskin.  R. 272-73.

On August 1, 2012, Botsay was seen by Nurse Allen for complaints of neck and back pain.  The assessment was lower back pain and knee joint pain.  She was told to take Chondroitin Sulfate, an over the counter medication.  R. 271-72.  On August 22, 2012, she returned to Nurse Allen.  Based on the x-ray of the right knee, she was referred to orthopedics.  R. 412

On August 27, 2012, there was an MRI of the left foot at the Interim LSU Public Hospital ("LSU") ordered by Dr. Fulmer.   The impression was moderate to high-grade sprain of the lateral collateral ligament of the second metatarsal phalangeal joint.  R. 403.

On September 18, 2012, Botsay was seen by Nurse Allen for complaints of a dry cough that occurred at night.   In addition to the Celebrex, Promethazine VC-Codeine was prescribed. R. 269-270.

On October 16, 2012, Botsay was seen by Nurse Allen for complaint of knee pain.  The assessment was knee joint pain. It was localized primary osteoarthritis of the right knee.  She was to consult with physical therapy and orthopedic surgery.  Tramadol was prescribed.  R. 268.

On October 18, 2012, Botsay was seen by Miljana Mandich, M.D., an internist, for a consultative examination.  R. 423-27.  She complained of low back pain and pains along the radial aspect of the left wrist and left thumb.  R. 423.  The summary included,

> [P]atient ambulates with a slight limp favoring the right knee without an assistive device.  She has full range of motion of all joints at this time including the right knee.  The spine and back examinations are normal with no pain and no restrictions in the range of motion at this time.  She has normal gripping, grasping and dexterity bilaterally.  There are no visible abnormalities of her feet.  Medical records contain a right knee x-ray report form May of this year [2012] that describes moderate tricompartmental osteoarthrosis with possible chondrocalinosis.  She has been referred to LSU orthopedic clinic.

R. 427.

On December 12, 2012, Botsay was seen by Dr. Fulmer for pain in both feet.  A nerve block of a peripheral nerve was indicated.  Cymbalta and Celebrex were prescribed.  R. 310.  On December 17, 2012, Botsay was seen by Nurse Allen for hip, knee and hand pain.  She was to keep her orthopedics appointment and get her pain medication prescription filled.  R. 309-310.

On January 18, 2013, Botsay was seen at LSU by Sohale Sadeghpour, M.D., an orthopedist, for problems with her right knee, left foot, both hands and right shoulder.  R. 360-70.  There was shoulder pain, bilateral hand pain and rotator cuff tendonitis.  R. 360.  The results of the physical exam of the right shoulder were:  full abduction and flexion with active range of motion; and positive full can, Whipple and Hawkins tests.  There was good strength with internal and external rotation.  The assessments were supraspinatus (one of four muscles that make up rotator cuff) tendinitis and bilateral thumb carpometacarpal arthritis.  R. 362.  She was to continue on Celebrex and Ultram, return in six months, and x-rays were ordered.  R. 363.

On February 18, 2013, Botsay was seen by Dr. Fulmer for complaint of pain in her left foot.  She was taking Tramadol.  She continued to have pain in her left foot but now had new dorsal foot pain.  The Celebrex helped with the pain, but the she was allergic to Cymbalta.  She reported that the LSU orthopedist examined her hands and shoulder, but was not able to examine her feet because she did not have x-rays of her feet.  She was to return to the orthopedist in July.  X-rays of the foot were ordered.  A follow-up visit was scheduled.  The assessments were:  (1) tendonitis peroneal; (2) bunion; and (3) localized primary osteoarthritis of the right knee.  She had lateral collateral ligament sprain of the left second metatarsophalangeal joint.  R. 307-308.

On March 6, 2013, there were x-rays of right knee, left knee and right foot.  The x-ray of the right knee was compared with the August 8, 2012 x-ray.  The degenerative issues were unchanged.  R. 353.  The impression for the left knee was mild degenerative changes.  The degeneration in the right knee was more pronounced.  R. 354.  The impression for the left foot was: bunion deformity and mild degenerative changes as described.

> Periarticular erosion at the first interphalangeal joint . . . .  Such findings can be seen in inflammatory arthritis like rheumatoid.  The less likely possibility would be Gout.

R. 355.

On March 11, 2013, x-rays of the right foot were examined by Nurse Allen at JPHC, who referred Botsay to LSU rheumatology.  R. 305-06.  On March 27, 2013, her prescription for Tramadol was refilled.  R. 305.  Between January 18, 2013 and July 18, 2013, Nurse Allen completed a questionnaire provided by counsel for Botsay.  Although counsel's letter to Nurse Allen is dated December 4, 2012, the response is not dated.  In response to questions 3 and 4, Nurse Allen reports that Botsay was seen at the orthopedics department on January 18, 2013 and her next orthopedic appointment would be on July 18, 2013.  R. 356-57.

12

On April 10, 2013, Botsay was seen by Nurse Allen at JPHC for pain in the right arm and a prescription refill.  The assessment was shortness of breath and knee joint pain.  R. 303-305.  On April 23, 2013, Botsay was seen by Nurse Allen for complaints of earache, headache, and possible sinus infection.  The assessment was allergic rhinitis and acute sinusitis.  A nasal spray and Claritin were prescribed.  R. 302-03.

On July 19, 2013, Botsay was seen at LSU by Edward Smith, M.D., an orthopedic resident.  R. 344-352.  She reported pain in her shoulder and knee.  R. 344.  She was referred to occupational therapy for evaluation and treatment.  She was to continue on Celebrex and Tramadol.  R. 346.  She was to return in six months.

On August 1, 2013, Botsay was seen at LSU for occupational therapy and given instruction on home exercises.  R. 341.

On October 4, 2013, Botsay was seen at LSU by Lane Rush, M.D., an orthopedic resident.  R. 335-340.  She reported complaints with her right shoulder, right knee, both hands and both feet.  Although occupational therapy gave her home exercises to perform, her condition had not improved.  She was seen by physical therapy for pain in her right knee.  She was to have an EMG for carpal tunnel syndrome.  She complained of pins and needles in both of her feet.  She complained that her right shoulder was locking up on her and causing pain.  R. 335.  She was referred to physical and occupational therapy for the right shoulder impingement and right knee osteoarthritis.  She was to continue with Celebrex and Ultram.  She was to return after the EMG.  R. 337.

On November 4, 2013, Botsay was seen at LSU by Clinton McCready, M.D., a resident, for EMG studies.  R. 332-333.  The studies were consistent with right borderline mild carpal

tunnel syndrome.  There was no evidence of left carpal tunnel syndrome.  There was no EMG evidence of right cervical radiculopathy.  R. 333

On December 13, 2013, Botsay was seen at LSU by Tyler Clark, M.D., an orthopedic resident, for the EMG results.  Her shoulder continued to lock-up and she reported polyarthropathy.  R. 326-327.  She was to return in two months.  An MRI of the shoulder was ordered.  She was sent to occupational therapy for a night-time splint.  A rheumatic work-up was ordered to identify other reasons for polyarthropathy (multiple joint disease).  R. 327.  On February 11, 2014, LSU performed an MRI of the shoulder.  R. 435-37.

On March 7, 2014, Botsay was referred by Mae Young, M.D., an LSU orthopedic resident, to physical therapy for evaluation and treatment for rotator cuff (capsule) sprain.  The right knee was injected with Triamcinolone Acetonide (synthetic corticosteroid) and Lidocaine (local anesthetic agent).  Naproxen was prescribed.  She was to return in three months.  R. 428-429 and 433-434.

e.    **Plaintiff's Appeal**.

**Issue**.  Did the ALJ abuse his discretion in evaluating Botsay's credibility and residual functional capacity ("RFC")?

The ALJ found that Botsay had the RFC for sedentary work with some limitations including "frequently performing overhead reaching with the dominant right upper extremity. . . ."  R. 29.  Botsay argues that:

> The issue in this case hinged on the limitations involving use of Plaintiff's upper extremities, most notably her right upper extremity.  If Plaintiff is limited to frequent use of her dominant right upper extremity as found by the ALJ, then denial at Step 4 was appropriate.  However, if the Plaintiff retained the RFC for only occasional use of her right upper extremity, then this would confer a finding of disability at Step 5. . . .

Rec. doc. 14 (Memorandum at 11).  This followed from the testimony of the vocational expert that if her right upper extremity was limited to occasional, Botsay would be unable to return to her past relevant jobs.  R. 79-80.  The Commissioner responds that the ALJ recognized that the condition of Botsay's right shoulder limited her "to only frequent, as opposed to constant, overhead reaching and frequent, as opposed to constant, handling, fingering, and feeling with her dominant right upper extremity."  Rec. doc. 15 (Memorandum at 5).

Botsay focuses on the ALJ's consideration of a report of a February 11, 2014 MRI of the right shoulder (R. 435-36), the results of a July 19, 2013 examination by Dr. Edward Smith, an orthopedic resident at LSU (R. 282-83), and the ALJ's finding on credibility.  Rec. doc. 14 (Memorandum at 11-15).

The earliest medical evidence is Botsay's visit to JPHC and Nurse Allen on May 22, 2012 at which time Botsay made no complaint about her right shoulder.  Her chief complaint was described as swelling in the right knee.  She reported that about a year before, she fell on the knee.  The assessment was pain in the knee joint and hand.  X-rays of the hands and knee were ordered.  R. 415.  On May 23, 2012, her chief complaint to Dr. Fullmer was the pain on top of her foot.  R. 414.  On May 29, there were x-rays of the foot, knee and hand, but none of the right shoulder.  R. 387-89.

On October 18, 2012, Botsay was seen by Dr. Mandich, an internist, for a consultative examination.  She complained of low back pain since she fell and pains along the left wrist and thumb.  R. 423.  The findings on the physical examination for the extremities were:

> She has arthroscopy scars on the right shoulder and no other visible abnormalities of any of the joints.  The patient has full range of motion of all joints including both shoulder [sic] and both knees.  The knees are the same circumference measurements with no evidence of joint effusions.

15

R. 426.   The results of the neurological portion of the physical examination included the statement that:

> There is normal symmetrical muscle bulk, tone and strength, including gripping, grasping and dexterity bilaterally.   There are symmetrical circumferences of the upper arms, forearms, thighs and calves.   There is normal superficial sensation and 1+ symmetrical deep tendon reflexes.   The patient ambulates with a slight antalgic gait favoring the right knee without an assistive device.

R. 426.   Dr. Mandich states that Botsay "has full range of motion of all joints at this time including the right knee."   R. 426-27.

On December 12, 2012, Botsay was seen by Dr. Fulmer.   Her chief complaint was pain in both feet.   She also complained that "her hands, knees, back and shoulder are painful."   R. 310.   This is the first instance in the record where she reported pain in her shoulder.

On January 18, 2013, Botsay was seen by Dr. Sadeghpour, an orthopedic resident at LSU, and reported pain in her right shoulder.   R. 362-63.   She described it as chronic.   She said she did not have any issues with her shoulder until a year or so earlier.   R. 362.   Although she described the pain as chronic and a problem for about year (R. 362), there are no reports of it prior to December 12, 2012 (R. 310).   The physical exam revealed full abduction and flexion with active range of motion.   R. 362.   An x-ray of the shoulder was ordered.   R. 363.   She was referred to physical therapy for her right shoulder and was to return in July, 2013.   R. 363.   On February 18, 2013, Botsay did not report any problem with her shoulder to Dr. Fulmer.   R. 307.   On April 11, 2013, she was seen by Nurse Allen.   She reported pain in right arm and shortness of breath.   She did not report pain in her right shoulder.   R. 303

When Botsay returned to LSU on July 19, 2013, she was seen by Dr. Edward Smith, an orthopedic resident.   She reported pain in her right shoulder with overhead motion and when she rolled over onto it at night.   R. 344-45.   The results of the orthopedic physical examination on

July 19, 2013, were the same as the results on January 18, 2013 (R. 346 and 362).  She was referred to occupational therapy for evaluation and treatment of her shoulder pain.  R. 344 and 346.  On August 1, 2013, she was seen for occupational therapy.  R. 341.

On October 4, 2013, she returned to LSU, where she was seen by Dr. Lane Rush, an orthopedic resident.  Botsay reported that there was no improvement with the home exercises given to her by Occupational Therapy.  She reported that the right shoulder kept locking up and causing pain.  R. 335.  The results of the physical exam for the right upper extremity were:

> No gross deformities, no erythema (no reddening of the skin due to inflammation), no ecchymoses (no bleeding spot in the skin), no skin changes.  Range of Motion for shoulder:  full forward flexion, full abduction, full external rotation, full internal rotation, pain with O'Brien's test and Hawkins test and negative belly press.

R. 336.  The right shoulder x-rays did not show any fractures or bony abnormalities.  R. 337 and 340.  The diagnosis was most likely right rotator cuff impingement recurrence.  R. 337  She was referred to physical therapy/occupational therapy for rehab of the right shoulder.  R. 337.  She was to return if the symptoms failed to improve after an EMG.  R. 338.  The November 4, 2013 EMG did not present any evidence of right cervical radiculopathy.  R. 333.

On December 13, 2013, Botsay was seen at LSU by Dr. Tyler Clark, an orthopedic resident.  R. 326.  She complained of polyarthropathy (multiple joint disease).  She reported that her right shoulder continued to lock.  R. 326.  She was referred to Occupational Therapy for evaluation and treatment.  An MRI of the right shoulder was ordered.  R. 327.

On February 11, 2014, there was an MRI of the right shoulder.  R. 435-36.  The impressions were:  (1) chronic tendinosis at the supraspinatus tendon without full-thickness test

or retraction;[1] (2) calcification/chronic tear of the coracoclavicular ligament; and (3) moderate chronic degenerative changes at the AC joint with subacromial bursitis.  R. 435-37.

    1.  <u>February 2014 MRI</u>.

Botsay contends that the ALJ erroneously described the February 11, 2014 MRI as revealing no tendonitis.  Rec. doc. 14 (Memorandum at 11).  The ALJ's decision states twice on page 33 that the "MRI of the shoulder showed no tendonitis, biceps tendonitis."  R. 33.  The Commissioner responds that the ALJ was citing to Exhibit B14F-page 2 of 10.  R. 33.  This is R. 429.  It is a page from the LSU records for March 7, 2014, when Botsay was seen by Dr. Young, an orthopedic resident, for right shoulder pain and right knee pain.  R. 428.  The Commissioner states that R. 429 "is not a very clear copy and it looks like the copy says 'no tendonitis, biceps tendonitis' which is what he stated in his decision. . . ."  Rec. doc. 15 (Memorandum at 3).

R. 429 is not a clear copy.  The physical exam for the right shoulder revealed pain on supraspinatus testing.  After describing the results of the physical exam for the right knee and what the x-rays of the right knee revealed, Dr. Young referred to the MRI of the shoulder.  The page states either:

    Mri shoulder shows no tendonitis, biceps tendonitis

        or

Mri shoulder shows rc tendonitis, biceps tendonitis

While the Court understands how the ALJ read the blurred word as "no", it appears it is "rc" - the initials for rotator cuff.  If so, Dr. Young described the February 11, 2014 MRI of the shoulder as showing rotator cuff tendonitis, biceps tendonitis.  R. 429.  This appears consistent

---

[1]  Chronic tendinosis is damage to a tendon.  www.ncbi.nlm.nih.gov/pmc/articles/PMC3312463/  The supraspinatus muscle is one of four muscles forming the rotator cuff.  radiopaedia.org/articles/supraspinatus-muscle-and-tendon  The MRI was indicating damage to a tendon in one of the muscles in the rotator cuff.

with the impression found on the MRI.  R. 436.  It is consistent with the reference under comments to "RC tendonitis" on R. 428.

If the ALJ's description of the blurred record was incorrect, the Court must determine whether this error was harmless.  "Procedural perfection in administrative proceedings is not required as long as the substantial rights of a party have not been affected."  Audler v. Astrue, 501 F.3d 446, 448 (5th Cir. 2007) (quotation marks omitted).  See also Newton v. Apfel, 209 F.3d 448, 458 (5th Cir. 2000) (where claimant required to show prejudice from ALJ's failure to request additional information).

The ALJ's remaining description of the February 11, 2014 MRI and the March 7, 2014 report by Dr. Young was accurate.  Dr. Young's assessment is rotator cuff (capsule) sprain.  This is repeated under the plan with the statement that Botsay was referred to physical therapy for evaluation and treatment. R. 429.  The ALJ refers to the rotator cuff sprain assessment in his decision.  R. 33.  Dr. Young reported positive results for testing of the supraspinatus muscle for pain.  R. 433.  This was noted by the ALJ.  R. 33.  One of the severe impairments found by the ALJ was right rotator cuff sprain and tendonitis.  R. 28.  As is demonstrated below, there is substantial evidence for the ALJ's finding that Botsay's statements regarding the severity of her impairment were not fully credible.  Botsay was not prejudiced by the ALJ's incorrect description of the February 11, 2014 MRI.

2.  July 19, 2013 examination by Dr. Edward Smith.

Botsay takes issue with the ALJ's description of the report of the July 19, 2013 examination by Dr. Edward Smith, an orthopedic resident at LSU.  Rec. doc. 14 (Memorandum at 11-12).  The ALJ stated that the "July 2013, physical examination was within normal limits." R. 32.

As regards the history of Botsay's shoulder pain, the report for the July19, 2013 examination described her as having chronic shoulder and bilateral hand pain.  There had been surgery on her shoulder five years before.  She experienced pain with overhead motion and when she rolled over onto her shoulder at night.  R. 345.  On the orthopedic physical exam, there were positive results for the full can, Whipple and Hawkins tests.  R. 346.  As noted by the Commissioner, the Hawkins test and other tests are diagnostic in nature and do not address the functioning of her shoulder.  Rec. doc. 15 (Memorandum at 3-4).  For the shoulder, the remainder of the examination showed full abduction and flexion with active range of motion and good strength with internal and external rotation.  R. 346.  As to the shoulder, the examination results were within normal limits.

Botsay contends that the July 13 examination's objective findings regarding her right knee, and both hands and thumbs support her testimony regarding her limitations involving her dominant upper extremity.  Rec. doc. 14 (Memorandum at 12).  She had pain in the bases of both thumbs and when she tried to open a jar.  R. 345.  On the orthopedic examination, Dr. Young noted that both hands had pain and crepitus in thumb CMC (carpometacarpal joint) with grind test.[2]  R. 346.

Botsay also cites the ALJ's description of the May 29, 2012 x-ray of the left hand.  She states, "[t]he ALJ also asserts that x-rays of the Claimant's hand revealed no acute abnormality, as if to imply that the x-ray was normal and he described Plaintiff's pathology as only "mild carpal tunnel."  Rec. doc. 14 (Memorandum at 12).  Botsay mischaracterizes the ALJ's decision and the record.  The impression of the May 29, 2012 x-ray of the left hand is "Degenerative changes at the first CMC second and third PIPs.  No acute radiographic abnormality."  R. 388.

---

[2]  The thumb CMC grind test assesses the integrity of the thumb CMC joint.  www.physio-pedia.com/Thumb_CMC_Grind

The ALJ states, "Left hand x-ray revealed three degenerative joint disease and no acute radiographic abnormality." R. 32. The ALJ's statement regarding the x-ray is accurate.

The ALJ's description of Botsay's severe impairments included "right borderline mild carpal tunnel syndrome." R. 28. On November 4, 2013, there was an EMG. R. 332-333. The impression was:

> EMG and nerve conduction studies consistent with right borderline mild carpal tunnel syndrome. No evidence of left carpal tunnel syndrome. No EMG evidence of right cervical radiculopathy.

R. 333 (emphasis added). The next visit to LSU after the EMG was on December 13, 2013. She was seen by Dr. Clark. R. 326-327. His report states, "EMG only showed mild RCT (right carpal tunnel), and nothing on the L (left) side." R. 326. The ALJ's description of Botsay's carpal tunnel condition was in accord with the medical evidence.

The ALJ's descriptions of the July 19, 2013 examination, the x-rays of the left hand and her carpal tunnel syndrome were accurate. They were in accord with his finding that Botsay was capable of frequently performing overhead reaching.

3. Credibility.

In his consideration of the issue of credibility, the ALJ reviewed: (1) the function report completed by Botsay (R. 30-31); (2) the report of the consultative examination by Dr. Mandich (R. 31); (3) the record of her treatment at JPHC and LSU (R. 31-33); and (4) a state agency RFC (R. 32). The ALJ found that Botsay's statements regarding the severity of her impairment or the degree of her limitations were not fully credible. The ALJ noted that the medical evidence, as regards the right shoulder, showed a history of right rotator cuff sprain and tendinitis, right shoulder impingement with full range of motion, right shoulder pain on supraspinatus testing,

21

and the incorrect statement that "MRI of the shoulder showed no tendonitis, biceps tendonitis." R. 33.

The ALJ framed the issue as to whether her impairments compel her to lie down several times a day.  The ALJ found this was not supported by the record because: (1) no doctor recommended that she take such rest each day; (2) no doctor placed any restrictions or limitations on her; and (3) she described daily activities not limited to the extent one would expect with her complaints of disabling symptoms and limitations.  R. 33.

Botsay argues that the ALJ ignored her employment history in evaluating her credibility. Botsay had increasing earning every year from 1971 to 1985.  Thereafter her earnings rose and pulled back (for example 1990 - $18,501.32; 1991 - $16,125.22; and 1992 - $12,245.46).  She continued to have earnings from 1993 through 2011.  R. 177.  A prior work record is one of the factors in evaluating credibility.  Social Security Ruling 96-7p, 1996 WL 374186, *5(S.S.A.). The ALJ considered Botsay's earnings records in finding that she remained insured through September 30, 2016.  R. 26 and 28.  The ALJ recorded that Botsay "testified that she had a lengthy history of clerical work. . . ."  R. 30.  The ALJ's discussion of the finding that her statements are not fully credible does not refer to her employment history.  R. 33.

Botsay argues that the ALJ mischaracterizes the information provided in her function report and her testimony on her activities.  Botsay completed a function report on September 10, 2012.  R. 181-188.  The ALJ's description of Botsay's responses to the questions in the function report is found at R. 30-31.  It is accurate.  For example, the ALJ states that, "she does some household chores, prepares simple meals, washes dishes, and cleans the bathroom but needs help making up the bed."  R. 30.  In response to question 13 of the function report, Botsay indicated that she prepared her own meals and described this as making sandwiches and smoothies and

cooking eggs.  In response to question 14 (list household chores you are able to do), Botsay listed wash dishes, clean toilet, wipe counter in kitchen, but could not do laundry and needed help making bed.  R. 183.

In his discussion of the finding that her statements are not fully credible, the ALJ stated that, "the claimant reported that she could take care of her personal needs, cook, and perform household chores independently. . . but with some help from her sister. . . ."  R. 33.  The information provided in the function report is consistent with this statement.  The ALJ cites Dr. Mandich's report on personal and social history where he states that Botsay "lives alone and does all activities of daily living including driving."  R. 424.  The ALJ relied on Botsay's testimony concerning the help provided by her sister.  R. 63-64.

The Commissioner argues that Botsay's testimony as to her limitations was not corroborated by the objective medical evidence.  The Commissioner cites:  (1) the limited number of times that Botsay sought treatment for her right shoulder; (2) the absence of any complaint about the right shoulder in Dr. Mandich's report of his consultative examination; (3) the presence of objective results of physical examinations, for example normal range of motion and lack of muscle atrophy or weakness; (4) the absence of any notes in the medical records of her inability to perform basic activities; and (5) the referral to physical therapy and occupational therapy for home exercises.

The March 7, 2014 record of her visit to LSU for examination by Dr. Young is the most recent medical record.  R. 428-433.  Botsay was there because of her shoulder problem, arm pain and to obtain the results of the February 11, 2014 MRI.  R. 431  Her shoulder problem and arm pain were her chief complaints.  R. 433.  As previously noted, there was right shoulder pain on supraspinatus testing and the MRI showed rotator cuff tendonitis and biceps tendonitis.  R. 433

The assessment was rotator cuff (capsule) sprain.  R. 434.  Dr. Young's plan provided physical therapy for her right shoulder and right knee.  It included weight bearing exercises and weight loss.  R. 434.  Physical therapy is not consistent with the limitations described by Botsay.  For example, Botsay said that after breakfast she sat in her chair for two hours until her knee became stiff and she got up for 15 minutes.  R. 182.  Botsay was not to return to LSU for three months until June 7, 2014.  R. 430. Dr. Young did not impose any limitations on Botsay's activities.  R. 434.  Botsay was not given any other instructions.  R. 430.

The report of the March 7, 2014 visit to Dr. Young is illustrative of the lack of corroboration found in the medical records for Botsay's statement of limitations.  Even if the ALJ mischaracterized the function report and Botsay's testimony at the hearing, the medical record provides substantial evidence to support the finding that Botsay's statements regarding the severity of her impairment and the degree of her limitations were not fully credible.  There is substantial evidence to support the ALJ's determination of Botsay's residual functional capacity.

### RECOMMENDATION

IT IS RECOMMENDED that:  (1) the Commissioner's cross-motion for summary judgment (Rec. doc. 15) be GRANTED; and (2) Botsay's motion for summary judgment (Rec. doc. 14) be DENIED.

### OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such

consequences will result from a failure to object.  <u>Douglass v. United Servs. Auto. Ass'n</u>, 79

F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 22nd day of July, 2015.

**SALLY SHUSHAN**
**United States Magistrate Judge**